**CONGREGATIONAL CHURCH OF JESUS IN SAMOA and AMERIKA SAMOA BANK, Plaintiffs**

**v.**

**AMERICAN SAMOA GOVERNMENT, MARY ROE 1-10, JOHN DOE 1-10, Defendants**

High Court of American Samoa
Land and Titles Division

LT No. 3-96

January 13, 1997

Before RICHMOND, Associate Justice, AFUOLA, Associate Judge, and ATIULAGI, Associate Judge.

Counsel: For Plaintiff Congregational Church of Jesus in Samoa, Afoa L. Su`esu`e Lutu
 For Plaintiff Amerika Samoa Bank, William H. Reardon
 For Defendant American Samoa Government, Henry W. Kappel, Assistant Attorney General

Opinion and Order:

On February 2, 1996, plaintiffs Congregational Church of Jesus in Samoa ("CCJS") and Amerika Samoa Bank ("ASB") filed this action against defendant American Samoa Government ("ASG"), to have the parties' rights and obligations under a lease agreement and related documents judicially declared and to prevent the ASG from evicting the CCJS from the leased premises pendente lite.

The court issued a temporary restraining order forestalling the ASG from immediately evicting the CCJS and stopping the CCJS's use of the leased premises. On February 14 and 15, 1996, the court regularly heard the order to show cause on issuing a preliminary injunction to the same effect pendente lite. All counsel were present.

During the hearing, the court advanced and consolidated the trial on the merits with the hearing on the preliminary injunction application, in accordance with T.C.R.C.P. 65(a). At the conclusion of the hearing, the court imposed a preliminary injunction, incorporating the terms of the temporary restraining order. On February 26, 1996, the ASG answered the complaint and counterclaimed for alleged violations of the American Samoa Coastal Management Act, for summary eviction, and for unpaid liabilities under the lease. The court conducted further trial proceedings on May 13 and 14, 1996, with all counsel present.

## FINDINGS OF FACT

The story of the present controversy truly began in 1986 and puts at issue some 0.83 acres of land, within or immediately adjacent to Pago Pago Park, in Pago Pago, American Samoa, and the building and fixtures on the land. Those premises, which the ASG owned in 1986, were commonly known as the "bowling alley" and had housed a privately-

125

operated bowling alley during two earlier periods. In 1986, the ASG was searching for a third private operator.

On October 24, 1986, the ASG leased the land to Coral Corporation ("Coral"), an American Samoa corporation. The ASG also sold the building and fixtures to Coral for $75,000, $50,000 paid in cash and $25,000 payable in monthly installments, evidenced by a promissory note.

Coral was to operate indoor recreational facilities on the premises, featuring bowling, eating, and related activities. Coral could, with the ASG's prior written consent, use the premises for other commercial or business purposes, not inconsistent with the ASG's policies and plans then in effect for Pago Pago Park.

The initial lease term was nine years, from October 20, 1986, to October 19, 1995. Coral was given options to renew the lease for four successive nine-year terms, by exercising the option in writing at least three months prior to the end of the first and each succeeding term.

Coral was allowed rent-free use of the land for the first six months. It was then required to pay monthly, beginning in April 1987, $900 in rent for the land, along with $245 on the amortized $25,000 of the purchase price of the building and fixtures. The rent was subject to periodic adjustments, pursuant to A.S.C.A. § 37.2025, fixed by renegotiation or arbitration. Coral was also committed to, and did, invest a minimum of $575,000 in the premises during the first lease year to carry on the authorized purposes of the lease.

Paragraph E of clause 15 of the lease permitted Coral to assign the lease or sublet the premises, with the ASG's prior written consent, not unreasonably withheld; provided that Coral remained primarily liable for performance of the lessee's lease obligations and the premises continued to be used only for the purposes permitted by the lease, unless the ASG gave prior written consent for other uses.

Coral or any successor was authorized under paragraph O of clause 15 of the lease, as amended on December 5, 1988, to use the leasehold, with the ASG's prior written consent, not unreasonably withheld, to secure loans by commercial financial institutions for purposes related to the lease purposes; provided that, in the event of a default of the loan, the

126

security agreement must require the lending institution to assume all of the lessee's lease duties, including the rental payments.[1]

On June 29, 1987, the ASG consented to Coral's mortgage of the leasehold to the ASB. The consent gave the ASB the right to enforce the mortgage, including upon foreclosure authority, without the ASG's further consent, to sublet or assign the leasehold, so long as the assignee assumed all of the lessee's lease obligations. The ASG's consent to mortgage remained unchanged when paragraph O was amended.

Contemporaneously with the paragraph O amendment, on December 5, 1988, the ASB loaned Coral $660,000. The loan proceeds were used primarily to acquire furniture, fixtures and equipment for the recreational facilities on the premises, with those items as the collateral for the loan. The ASB made another smaller loan to Coral a year later.

The bowling alley operation failed once again, and on November 15, 1990, the ASB commenced action against Coral, CA No. 101-90,[2] to collect on the loan promissory notes, foreclose on the loan security, and appoint a receiver. The court appointed the ASB as the receiver on December 6, 1990. The ASB carried on as the receiver until it was discharged in 1993 after the CCJS entered the picture in 1992.

On July 5, 1991, Coral notified the ASG's Real Property Management Board in writing of its intentions to suspend operations, except for the lounge and restaurant, and sell the existing bowling furniture, fixtures and equipment, and requested the board's approval to rent the bowling alley space for storage or warehouse purposes while searching for an experienced U.S. joint venturer. The ASG's response, if any, is not in evidence. On June 12, 1992, the ASB wrote to the Governor, confirming the receivership and offering the ASG first opportunity before proceeding with a planned public auction of the furniture, fixtures and equipment. Again, the ASG's response, if any, is not in evidence. Jim Brittle, the key person in the Coral program, personally informed the Governor's Chief of Staff of developments during the 1990-1992 period.

On August 18, 1992, the CCJS purchased the building and fixtures from Coral, and Coral assigned leasehold to the CCJS. The ASB also loaned

---

[1] The original paragraph O did not require the ASG's consent to use the leasehold as security, and was worded differently in that the security agreement must require the lending institution to be fully responsible for the rental payments in the event of a default of the loan and surrender the land to the ASG when the loan is satisfied.

[2] We take judicial notice of this action.

127

the CCJS $675,000 to finance the acquisition, secured by the leasehold and the building and fixtures.[3] On August 28, 1992, in CA No. 101-92, the court approved the transactions, and the ASB paid the ASG $27,150 to bring the lease rent and amortization payments to the ASG current.[4]

From August 18, 1992 to the present time, the CCJS used the premises to conduct fund-raising bingo games in the building, renamed "Tautua Community Hall" ("hall"), and rented the hall for the same purpose, regularly to other churches but also to the ASG (for a proposed sports stadium) and occasionally for other meetings.[5] The CCJS also subleased restaurant and lounge space. The CCJS held a "grand opening" in September 1992, which included bingo in the program. The Governor attended this event.

During this period, the CCJS made the lease rent and amortization payments to the ASG through the ASB. The ASB did not deliver the payment checks to the ASG every month but did deliver them at frequent intervals. Apparently the CCJS and ASB thought that the payments were totally current. However, as of October 19, 1995, when the initial term of the lease and the amortization payment period ended, $10,800 was still outstanding on the total of the rent and amortization payments due for that period. The amount due the ASG on this combined amount was reduced to $2,550 as of December 31, 1995. The CCJS and ASB acknowledged and are ready to pay this deficit.

The CCJS is current in paying the note to the ASB for the $675,000 loan. The outstanding balance on this long-term note is approximately $600,000.

---

[3] At the ASB's request, Western Appraisal Services estimated the value of the building at $675,000 as of February 15, 1994.

[4] Although filed after the court approved the sale to the CCJS, the receiver's final report of September 24, 1992 includes the ASG in the list of Coral's creditors. The ASB mailed the final report to all creditors on October 20, 1992, in connection with its motion to discharge the receiver and dismiss the action. No one, including the ASG, objected to either the final report or the motion. The court heard the motion on January 8, 1993 and discharged the ASB as the receiver on January 19, 1993.

[5] While there is conflicting evidence on whether the CCJS or its bingo "sublessees" or "licensees" consistently obtained the requisite license from the ASG for their activities, we are satisfied that there was substantial compliance with this requirement. The licensing process is also additional evidence that the ASG was aware of the activities on the premises.

128

On August 19, 1994, the CCJS applied for land use and building permits to construct extensions on both sides of the hall. The estimated project completion date was September 30, 1994. However, the ASG's Development Planning Office ("DPO") did not forward the application to the Governor until February 14, 1995. The Governor signed the declaration of ASG-owned land on February 21, 1995, and returned the application to the DPO on February 22. Then, on March 15, 1995, the DPO advised the CCJS to apply separately to the ASG's Zoning Board for a variance.

The CCJS received clear, written direction from the ASG not to begin construction until both the land use and building permits were issued. The CCJS also understood that application for those permits would be processed under the ASG's project notification and review system ("PNRS"), which is administered by a board comprised of representatives of the ASG agencies concerned with land use development, and issued only when the application review is completed with all necessary agency approvals. Nevertheless, the CCJS ignored this admonition and proceeded to construct the extensions.

The ASG caught up with this violation and discovered other violations in early 1995, and then issued formal stop orders on the partially but significantly completed work on February 16 and 22, 1995. However, the CCJS continued the construction, at least for a time. On February 28 and March 10, 1995, the ASG's site inspectors recorded noncompliance with a 50-foot stream setback and additional parking space requirements for commercial developments, and unauthorized drainage into the adjacent stream through a pipe extending from the hall, in addition to the lack of permits, and recommended denial of the application for the permits and removal of the extensions.

On March 23, 1995, with the PNRS board's prior approval, the board's chairman, citing the lack of permits, stream setback, and stop order violations, and citing the civil penalties provision of the American Samoa Coastal Management Act of 1990 ("ASCMA"), gave the CCJS 60 days to either remove the extensions and certain solid waste (largely scrap metal) behind the hall or pay a $30,000 fine and dispose of this waste, and 15 days to notify the DPO of its decision.

Apparently, representatives of the CCJS and the DPO had several discussions about the situation after the CCJS received the March 23 letter. However, on May 23, 1995, the CCJS informed the DPO that it opted for the fine alternative, but requested abeyance pending the Governor's follow-up decision on the matter when the Governor returned from an off-island journey.

129

The deadline for the CCJS's exercise of the option to renew for the second nine-year term of the lease was July 19, 1995. The CCJS let this date pass without exercising the option. No other significant developments occurred, at least in evidence, until September 1995. The ASG's Parks and Recreation Commission ("PRC") became active in the matter in that month.

On September 12, 1995, CCJS and ASB representatives were notified by telephone of a PRC meeting to take place the following day. The CCJS and ASB representatives conferred about the meeting and also the expiration date of the initial term of the lease. They prepared a letter addressed to the ASG's Director of Administrative Services to exercise the option to renew the lease for the next nine-year term.

The CCJS and ASB representatives attended the PRC meeting on September 13, 1995. The PRC discussed but did not make any decisions on the CCJS situation. After the PRC meeting, the CCJS and ASB representatives met with the Lieutenant Governor, who was then the Acting Governor. After they explained the current lease situation, the Acting Governor signed the approval line on the letter exercising the option to renew.

The PRC next met on the matter on October 12, 1995. This time the CCJS and the ASB received no notice and did not attend the meeting, but again the PRC only reviewed the CCJS situation and did not take any final action. However, the PRC took a different tack on November 1, 1995, with a reconstituted membership. This time the PRC voted to notify the CCJS that the lease would not be renewed. The CCJS and ASB received no notice of the meeting and were not in attendance.

On November 7, 1995, the PRC forwarded this recommendation to the Governor, and the Governor in turn notified the CCJS. Both documents gave as reasons the untimely exercise of the option to renew, disallowed use of the premises, accumulated solid waste and, in connection with the hall extensions, the lack of land use and building permits, disregard of the stop orders and violation of the mandated stream setback. The CCJS was told to vacate the premises by January 1, 1996. The Governor also advised the CCJS that the ASG opted not to purchase the building, equipment and other personal property as permitted under clause 13 of the lease.

The CCJS and ASB asked the Governor to reconsider this decision, and on November 28, 1995, the Governor directed the PRC to meet on the issue, saying he would support whatever decision the PRC reached. On November 29, 1995, the PRC re-examined the matter and renewed the

decision to terminate the lease. Once again the CCJS and ASB were not notified and did not attend this meeting. They learned of this development when the Governor wrote to the CCJS on December 20, 1995 and repeated the ASG's position taken on November 7, 1995, except to delay the termination date to January 15, 1996.

The ASB, on January 11, 1996, and the CCJS, on January 16, 1996, reiterated their appeals to the Governor. The Attorney General responded. On January 23, 1996, he ordered both entities to surrender the premises and remove any personal property within 10 days of receipt of this notice on the grounds that the CCJS and ASB were trespassers. The CCJS and ASB filed this action on February 2, 1996.

## DISCUSSION

### I. Claims by the CCJS and ASB.

### A. Standing.

First and foremost, this court must address the issue of the CCJS's and ASB's standing to claim redress. The ASG argues that the CCJS and ASB have no standing to assert any rights under the lease agreement ("Coral lease") and related documents because the assignment of the Coral lease from Coral to the CCJS was invalid.

The ASG correctly points out that, under paragraph E of clause 15 of the Coral lease, the ASG's prior written consent is an essential prerequisite to a valid lease assignment by the lessee. However, the ASG incorrectly claims that the Coral lease was assigned to the CCJS without such consent.

### 1. Actual consent.

On June 29, 1987, the ASG consented in writing to Coral's mortgage of the leasehold to the ASB to secure loans by the ASB to Coral. The ASG also consented to the following arrangement in that document: that "upon foreclosure thereof the Mortgagee [the ASB] may *without further consent of the Lessor* [the ASG] *or the Lessee* . . . sell and assign the leasehold estate by assignment : . . ." *See* Trial Exh. D (emphasis added).

The ASG's consent was not withdrawn, and was therefore still effective in 1990, when the ASB first chose to judicially foreclose the mortgage, with an interim receivership to keep the premises operational, and on August 18, 1992, when Coral assigned the leasehold to the CCJS. The ASG had actual knowledge that the ASB was pursuing these remedies in accordance with the 1987 consent to mortgage, and the ASG failed to

object.[6] Therefore, the Coral lease was assigned to the CCJS with the ASG's actual consent, given on June 29, 1987.

## 2. Waiver.

■ The ASG waived its right to object to the lease assignment to the CCJS when it accepted the CCJS's performance under the lease terms, even if Coral acted without the ASG's affirmative consent to the assignment. *See Pacific Gas &.Electric Co. v. Universal Electric & Gas Co.*, 271 P 377 (Cal. App. Ct. 1928) (citing *Staples v. Somerville*, 57 N.E. 380 (Mass. 1900) and *Kinser v. McMurray*, 181 N.W. 691 (Iowa 1921)). The ASG recognized and dealt with the CCJS as an assignee when it accepted rent payments from the CCJS under the terms of the Coral lease. The ASG is therefore estopped from claiming that the CCJS did not assume the rights and obligations under the Coral lease through a valid assignment.

Thus, alternative grounds exist for finding a valid assignment of the Coral lease to the CCJS: (a) because the ASG operatively consented to the assignment of the Coral lease to the CCJS by the 1987 consent to mortgage, or (b) because the ASG waived its right to object to the assignment when it accepted the CCJS's performance of leasehold obligations. We therefore hold that the CCJS has standing to sue as the assignee of the lessee's interest in the Coral lease, and the ASB has standing as the CCJS's leasehold mortgagee.

## B. Declaratory relief.

Next, we address the CCJS's and ASB's request for declaratory relief as to the rights and duties of the parties to the Coral lease.

## 1. The Coral lease was never effective.

■ The Legislature of American Samoa must by statute be given the opportunity to disapprove any lease of the ASG's land for a period of 10 years or longer. A.S.C.A. § 37.2030; *see Tuika Tuika v. Governor of*

---

[6] In 1990, this court approved the transaction whereby the CCJS assumed Coral's obligations under the mortgage with the ASB. Though the ASG did not participate in those judicial proceedings, and did not receive notice of the approval hearing, the ASG did receive notice of the hearing to discharge the receiver. Furthermore, the ASG was fully aware of Coral's loan default and the circumstances leading to the CCJS's takeover of the premises. The ASG did not terminate the Coral lease when the ASB was judicially appointed as the receiver, even though a receivership can trigger termination under clause 13 of the Coral lease.

132

*American Samoa*, 4 A.S.R.2d 85 (Trial Div. 1987). The Legislature has 30 days after it receives a submitted lease to adopt a disapproval resolution under § 37.2030. Any lease subject to legislative review becomes effective only after this 30-day period passes without negative action. The court in *Tuika* stated pointedly: "The Court further declares that all leases of government land in excess of ten years signed by the governor after the filing date of this action on June 25, 1986 will not be effective unless they are submitted to the Fono for review." *Tuika*, CA 74-86 at 1 (Trial Div. Sept. 9, 1986)(order granting declaratory and injunctive relief).

Legislative review provides another and broader perspective to guard against improvident long-term public land use. The statute provides the Legislature with a check on the Governor's executive power, by giving the Legislature the opportunity to review and disapprove any lease that will give the lessee an interest in government land for more than 10 years. Thus, the statute rationally and reasonably serves a legitimate public policy interest.

■ The Coral lease granted the lessee, Coral, or its assigns, the unilateral power to "renew" the lease for up to four successive terms of nine years each for a total of 45 years. The law traditionally distinguishes lease "extensions," which continue an existing lease, from lease "renewals," which create an entirely new lease. *See Haleck v. Lee*, 4 A.S.R. 519, 540-41, 554-55 (Trial Div. 1964). For the purposes of A.S.C.A. § 37.2030, however, this formal distinction is irrelevant when, as in this case, a lessee has *unilateral* power to continue the leasehold. Unilateral options can give a lessee complete and exclusive control over the use of land, whether they are "extensions" or "renewals," for prolonged periods. Section 37.2030 is designed to prevent the ASG Executive Branch from entering into leases that tie up government land for 10 years or more without the Legislature's independent evaluation. This court cannot overlook a legislated directive and grant the ASG's Executive Branch carte blanche to tie up public land and avoid legislative review for an extensive period, simply by entering into leases that give lessees unilateral options to "renew" for a series of terms of less than 10 years each--the method employed in the Coral lease. We will not permit application of the technical legal distinction between extensions and renewals of leases to subvert lawful public policy enacted by the Legislature. *See Haleck v. Governor*, 4 A.S.R. 968, 973 (App. Div. 1971).

The Coral lease, entered into after June 25, 1986, and potentially binding for 45 years, has never been subjected to legislative review. Therefore, the Coral lease has never become "effective," in accordance with the mandate of A.S.C.A. § 37.2030.

133

## 2. Effect of an invalid lease.

■ The RESTATEMENT (SECOND) OF PROPERTY § 2.3, comment d.,[7] states:

> Where, in addition to entry into possession under an invalid lease, rent is paid and accepted under the lease, a periodic tenancy is created. By the payment and acceptance of such rent, the parties have given further indication of their intention to be bound by the invalid lease, and the periodic tenancy provides a measure of security of their expectations.

Coral and the CCJS, its assignee, took possession of the land under an invalid lease, yet the ASG accepted payment of monthly rent from both Coral and the CCJS under the terms of the Coral lease. The parties thus created and maintained an at will periodic tenancy with all the terms of the Coral lease except duration.[8] *Id.* § 2.3(2). This tenancy was terminable at the will of either the lessor or the lessee with one month's notice. *Id.* §§ 1.5 & 2.3, comment d.

On November 7, 1995, the ASG notified the CCJS that the ASG decided to terminate the tenancy with the CCJS and directed the CCJS to vacate the premises by January 1, 1996, which was later postponed to January 15, 1996. The ASG thus gave at least one month's notice, as is required to terminate a periodic tenancy involving monthly rental payments.

Therefore, we conclude that the CCJS no longer has any rights to occupy the land beyond those of any holdover tenant at sufferance, and that we

---

[7] This section of the Restatement deals with the effect of a lease that is invalid because it violates the Statute of Frauds, not the effect of a lease that is ineffective because it violates A.S.C.A. § 37.2030. However, failing to conform to statutory writing requirements, which renders a lease "invalid," and failing to conform to the legislative review requirement of § 37.2030, which renders a lease "ineffective," are similar in that both involve deviations of technical requirements created and defined by statute. Therefore, without statutory guidance regarding the effect of a lease contravening § 37.2030, we believe that the situations are sufficiently analogous to warrant the application of the same legal principles.

[8] The option to renew for successive lease terms is a nullity, and thus, the CCJS's purported exercise of the option, with the Acting Governor's approval, on September 13, 1995 had no legal effect.

134

cannot grant the CCJS's and ASB's request to enjoin the ASG from attempting to evict the CCJS from the property through lawful means.

## 3. Due process.

The CCJS and ASB also submit that the decision of the Governor and the PRC to end the Coral lease deprived them of both procedural and substantive due process of law.

### a. Right to a hearing.

■ A claim of denial of due process, either procedural or substantive, cannot be sustained, absent proof of a deprivation of a 'liberty' or 'property' interest within the meaning of the Due Process Clause of Article I, § 2 of the Revised Constitution of American Samoa, *see Ferstle v. American Samoa Govt.*, 7 A.S.R.2d 26, 49 (Trial Div. 1988), or of the Fifth or Fourteenth Amendments of the U.S. Constitution. *Webster v. Redmond*, 599 F.2d 793, 796 (7th Cir. 1979), *cert. denied*, 444 U.S. 1039 (1979); *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976); *Dash, Inc. v. Alcoholic Beverage Control Appeals Bd.*, 683 F.2d 1229 (9th Cir. 1982); *Hunter v. Florida Parole & Probation Commission*, 674 F.2d 847 (11th Cir. 1982).

■ Not every interest is protected by procedural due process guarantees. *See Board of Regents v. Roth*, 408 U.S. 564, 570 (1972) ("the range of interests protected by procedural due process is not infinite"). Courts will not grant a party procedural due process rights, without examining the nature of the interest at stake to determine whether the party has a constitutionally protected claim of entitlement to the interest or has merely a unilateral expectation of the interest. *See id.* at 571, 577 (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). The claim must be derived from a statute or legal rule or through a mutually explicit understanding to be an enforceable right or entitlement. *Riverview Investments, Inc. v. Ottawa Community Imp. Corp.*, 769 F.2d 324, 327 (6th Cir. 1985) (citing *Leis v. Flynt*, 439 U.S. 438, 442 (1979); *see also Roth*, 408 U.S. at 576-7 (noting that the legitimacy of an expectation to specific government benefits can be grounded in statutory or administrative standards).

■ Though the CCJS and ASB believed that the Governor and PRC were depriving them of a leasehold and related entitlements without affording them an opportunity to be heard, the CCJS and ASB were in legal reality requesting that the Governor either continue an at-will periodic tenancy or establish a new lawful lease. Though courts have eschewed rigid definitions of "liberty" and "property" interests, we believe that an interest in continuing an at-will periodic tenancy is not a

135

constitutionally protected "liberty" or "property" interest. An at-will tenant may have a subjective need or desire for the relationship to continue but not a legitimate expectation for it to continue. *Roth*, 408 U.S. at 577; *Riverview Investments, Inc. v. Ottawa Community Imp. Corp.*, 769 F.2d at 327. No statute or administrative rule gives an at-will tenant an expectation that an at-will periodic tenancy will continue indefinitely and will be terminated only "for cause."

■ Additionally, we believe that one's interest in securing a future leasehold interest is not a constitutionally protected "liberty" or "property" interest. In *Board of Regents v. Roth*, the United States Supreme Court rejected the proposition that a university deprived a teacher of procedural due process when it failed to provide the teacher with a hearing after deciding not to rehire him following the expiration of his one-year contract. 408 U.S. at 575. Similarly, we think it stretches the concept of "liberty" and "property" too far to suggest that a person is deprived of liberty or property because an at-will periodic tenancy is not affirmatively prolonged. *See Ferry v. Udall*, 336 F.2d 706, 714 (9th Cir. 1964) ("there is no constitutional requirement to a right to a hearing where only a potential privilege to purchase United States land is involved").[9]

■ The Governor may voluntarily choose to grant audiences to anyone who seeks to maintain an at-will periodic tenancy or who proposes to lease government property. However, we hold that due process does not mandate that the Governor must conduct formal administrative hearings whenever he exercises his discretion to terminate an at-will periodic tenancy or acts on a proposal to lease government land.

**b. The PRC's role.**

Although we find that due process did not require any hearing on this matter because the CCJS's interests were not constitutionally protected "property" interests, we want to discuss the nature of the PRC's

---

[9] Since an at-will periodic tenancy is much like an open purchase order for goods, and an application for the privilege of leasing government land is much like a bid for government business, a contrary ruling in this case would unreasonably burden the ASG. Individuals and corporations doing business with the ASG could demand formal administrative hearings because the Governor refused to purchase goods or services under an open purchase order, or because the Governor refused to select their bid and award them a contract for goods or services. The transaction costs of procuring necessary goods and services for the ASG would skyrocket.

136

administrative proceedings. The CCJS and ASB aver that the PRC is an agency for purposes of the Administrative Procedures Act ("APA"), A.S.C.A. §§ 4.1001-4.1044, and conducted hearings concerning the Coral lease, which evolved into a contested case under the APA and thus required unafforded due process rights of reasonable notice and an opportunity to be heard. The ASG views the PRC as a non-APA agency providing advisory decisions and without authority to process a contested case.

 We agree with the ASG's position. Unquestionably, the PRC is a statutory agency of the ASG's Executive Branch. A.S.C.A. § 18.0101(a). An APA agency, however, "means each . . . commission . . . authorized by law to make rules or to determine contested cases." A.S.C.A. § 4.1001(a).[10] A.S.C.A. § 18.0102, which outlines the PRC's powers and duties, does not authorize the PRC to make rules or to adjudicate disputes. The statute merely empowers the PRC to "develop policies and programs," to "review and make recommendations to the Governor," and to "perform other assignments as the Governor may make." A.S.C.A. § 18.0102. The PRC's meeting minutes show that the PRC regularly makes recommendations to the Governor on private uses, by lease or license, of park lands. But offering recommendations is neither rule making nor adjudication. The PRC's action did not "determine" the CCJS's or ASB's legal rights, duties, or privileges. A.S.C.A. § 4.1001.

Therefore, since the PRC proceedings did not constitute resolution of a contested case under the APA, we also hold the CCJS and ASB had no right to notice of, or meaningful participation in, the PRC meetings, as a matter of procedural due process.

c. Substantive due process claims.

We also conclude that the Governor's decision to terminate an at-will tenancy or to accept or decline a proposal for a new lease is not vulnerable to substantive due process attacks. We emphasize that because a periodic tenancy is not a constitutionally protected property interest, substantive due process was not violated.

_____

[10] A rule "means each agency statement of general applicability that implements, interprets or prescribes law or policy, or describes the procedure or practical requirements of any agency," excluding "statements of internal management and not affecting private rights or procedures available to the public, or intra agency memoranda." A.S.C.A. § 4.1001(g). A contested case "means a proceeding . . . in which the legal rights, duties, or privileges of a party are determined." A.S.C.A. § 4.1001(b).

137

■ However, we wish to address the CCJS's and ASB's contention that the ASG's actions were an abuse of discretion. This court ensures that the ASG's Executive Branch respects a party's substantive due process rights by determining whether decisions of the Governor and his executive agencies were arbitrary and capricious, pretextual, or without a rational basis. *Anthony v. Franklin County*, 799 F.2d 681, 684 (11th Cir. 1986); *Barnett v. Housing Authority of the City of Atlanta*, 707 F.2d 1571, 1577 (11th Cir. 1983).

■ The Governor has "general supervision and control" of the ASG's executive functions, A.S.C.A. § 4.0111(b), including the lease of government land. We believe that a decision regarding the lease of government land is a matter solely within the Governor's discretion. *See Ferry v. Udall*, 336 F.2d at 712 (stating that a "decision of whether or not it would be in keeping with sound policy to sell a particular parcel of land at a certain offered price involves the exercise of informed discretion.").

The Governor was fully aware of the CCJS's and ASB's desire to continue the Coral lease, consulted with the PRC, and decided to terminate the Coral lease. He gave as reasons the untimely exercise of the option to renew for a second nine-year term, disallowed use of the premises, accumulated solid waste, disregard of land use and building permitting system, and violation of the stream setback. We cannot say on the evidence that the Governor's decision was arbitrary, capricious, or an abuse of his discretion. Therefore, we also conclude that his decision did not deprive the CCJS and ASB of substantive due process from this perspective.

Since we hold that the CCJS's and ASB's claims are without merit,[11] we now turn to the ASG's counterclaims.

## II. The ASG's counterclaims.

### A. American Samoa Coastal Management Act and Administrative Rules.

The ASG alleges that the CCJS violated the laws enacted and administrative rules promulgated in support of the American Samoa

---

[11] The CCJS and ASB also claim that the CCJS made a timely but rejected demand for arbitration. This issue is immaterial to the outcome, in our view, but we want to point out the ambiguous and the poorly drafted quality of the arbitration provision in the Coral lease.

Coastal Management Program and the accompanying land use and building permit system.

## 1. The constitutionality of the American Samoa Coastal Management Act of 1990.

First, as a defense, the CCJS and ASB challenge the constitutionality of the American Samoa Coastal Management Act of 1990 ("ASCMA"). A.S.C.A. §§ 24.0501-24.0510. This issue is particularly important, because the ASCMA provides the legal foundation for land use permits, A.S.C.A. § 24.0505, and the implementing administrative rules ("ASCMP rules") for the land use permit system. A.S.C.A. § 24.0506.

The CCJS and ASB argue that the ASCMA was enacted in violation of the policy protective legislation provision set forth in Article I, § 3 the Bill of Rights, of the American Samoa Revised Constitution of 1967. This section reads:

> **Section 3. Policy protective legislation.** It shall be the policy of the Government of American Samoa to protect persons of Samoan ancestry against alienation of their lands and the destruction of the Samoan way of life and language, contrary to their best interests. Such legislation as may be necessary may be enacted to protect the lands, customs, culture, and traditional Samoan family organization of persons of Samoan ancestry, and to encourage business enterprises by such persons. *No change in the law respecting the alienation or transfer of land or any interest therein, shall be effective unless the same be approved by two successive legislatures by a two-thirds vote of the entire membership of each house and by the Governor* (emphasis added).[12]

The Legislature enacted ASCMA only once in P.L. 21-35. Thus, the issue centers on the meaning of the phrase "alienation or transfer of land or any interest therein." The CCJS and ASB interpret this phrase to apply to legislation respecting interests in land of any kind and nature. The ASG applies the phrase to legislation respecting the alienation or transfer of any title interests, legal or equitable, in land.

---

[12] The emphasized portion of § 3 is substantively repeated in the article on the Legislature. Am. Samoa Rev. Const., art. II, § 9.

 We agree with the ASG's position on this issue. The policy set forth in § 3 is straightforward and clear. The protection afforded the Samoan people is prevention of the loss of their lands and way of life and language. Land use regulations impact activities on land and the manner in which an owner or possessor deals with land, but they do not divest title interests. Land use regulations also do not inherently impair cultural patterns. We do not find any ASCMA provisions that require double enactment, and therefore hold that the act is valid as enacted.

## 2. The validity of the American Samoa Coastal Management Program rules.

Second, the CCJS and ASB question the validity of the ASCMP rules, adopted by the Director of the Development Planning Office ("DDPO") pursuant t·) A.S.C.A. § 24.0506(a). In general, rule making is an essential component of the administrative process and is often the preferred procedure for the evolution of agency policies. *Trans-Pacific Freight Conference of Japan/Korea v. Federal Maritime Commission*, 650 F.2d 1235, 1244-45 (D.C. Cir. 1980), *cert. denied, Sea-Land Service, Inc. v. Federal Maritime Commission*, 451 U.S. 984 (1980). Administrative rules serve the important function of implementing the legislature's will without engaging in the time-consuming and often unfair process of case-by-case adjudication. *See Ernst & Ernst v. Hockfelder*, 425 U.S. 185, 213 (1976); *Mason v. National Flood Insurers Ass'n*, 431 F. Supp. 1021, 1023 (D. Okl. 1977) (stating that "a rule or regulation must be in furtherance of intention of the legislature as evidenced by the acts of the legislative body"). If properly promulgated, administrative rules have the force and effect of law and the presumption of validity, and much deference is due the agency charged with the administration of the statute. *See Lugo v. Simon*, 426 F. Supp. 28, 34 (D. Ohio 1976).

The CCJS and ASB challenge the ASCMP rules on the grounds of noncompliance with the rule-making process set forth in the APA.[13] The ASG resists that challenge on the grounds that the CCJS failed to demonstrate prejudice by any rule-making deficiency, and that the DDPO substantially complied with the rule-making procedures, the standard required by A.S.C.A. §4.1009(a).

---

[13] Rules can be contested for noncompliance with adoption requirements only within two years of their effective date. A.S.C.A. § 4.1007. The ASCMP rules were adopted on November 22, 1994, less than two years prior to the filing of this action.

■ Rule making under the APA involves several procedural steps. First, the ASG agency exercising rule-making authority must give at least 20 days notice of the adoption, amendment, or repeal of any non-emergency rule. A.S.C.A. §§ 4.1004 and 4.1010. The notice must include a statement of either the terms or substance of the proposed action or a description of the subjects and issues involved, and the time, place and manner in which persons may present their views on the matter. A.S.C.A. § 4.1004. The notice must be mailed to all persons who have requested advance notice of the agency's rule making, and must be at least publicized in all news or broadcasting media operated by the ASG. *Id.*

Next, the agency must give all interested persons reasonable opportunity to submit "data, views, and arguments, orally or in writing," either at a public he iring or by other suitable means, and consider those submissions before the rule is adopted, amended, or repealed. A.S.C.A. § 4.1005. These provisions are intended to ensure that rule making by administrative agencies is infused with openness, explanation, and participatory democracy which is essential to minimize the dangers of arbitrary and irrational decision making. *See State of S.C. ex rel Patrick v. Block*, 558 F. Supp. 1004, 1015 (D.S.C. 1983). A public hearing was required for the ASCMP rules. A.S.C.A. § 24.0506(a).

Third, the agency must file the rule with the Secretary of American Samoa, and with the Clerk of the House of Representatives and the Secretary of the Senate of the Legislature. A.S.C.A. § 4.1008. The Secretary of American Samoa is the Lieutenant Governor. Am. Samoa Rev. Const., art. IV, § 3. The rule becomes effective 20 days after the filing is complete, or later if required by statute or the rule. A.S.C.A. § 4.1009(c)(1).

■ Lastly, the agency must make the rule available for public inspection. A.S.C.A. § 4.1020(a). No ruli is valid or effective until this public inspection requirement is met, except as to any person who has actual knowledge of the rule. A.S.C.A. § 4.1009(b).

■ The printed ASCMP rule is prefaced by the DDPO's letter of · November 22, 1994, informing the Governor of the rule's adoption. The DDPO states in this letter that before adoption, the proposed rule was noticed, the subject of extensive commentary by public hearing and other means, and reviewed. Even though we do not have the specific documentary evidence before us, we accept the DDPO's letter and printed rule as demonstrating substantial compliance with all applicable rule-making procedures, including a public hearing and public inspection, except the requisite filing.

141

The DDPO has not filed the ASCMP rules with the Secretary of American Samoa and the Legislature. This omission is significant. The filing enables the Secretary to fulfill his responsibilities, under A.S.C.A. § 4.1020(b), to keep a permanent register of the administrative rules adopted by the ASG's various agencies and, under A.S.C.A. § 4.1003, to publish regularly the rules. By carrying out these functions, the Secretary fully informs the ASG's other agencies and the public at large of that which the law requires of them.[14] Furthermore, filing gives the Legislature an opportunity to learn how the Executive Branch is administering legislative enactments, and gives the Legislature a basis for recommending appropriate changes in the rules. A.S.C.A. § 4.1009(d). Thus, because the ASCMP rules were not filed with the Secretary of American Samoa and the Legislature, the ASCMP rules were not adopted in substantial compliance with the statutory mandates for rule making.

---

[14] The A.S.A.C. was first published in 1982 and was annually supplemented through 1989. No supplements have been published since to include in the A.S.A.C. either the ASCMP rules or any other rules adopted in and after 1990. Obviously, the Lieutenant Governors in office from 1990 to the present time have neglected to carry out, as the Secretary of American Samoa, the duty prescribed by A.S.C.A. § 4.1003 to publish the administrative rules at least once every two years.

The court takes judicial notice that the Lieutenant Governors in office from 1978 through 1990 maintained a permanent register of the administrative rules, as required by A.S.C.A. § 4.1020(b). This register included not only the rules as adopted, but also the public notices of the intended adoption of each rule, certificates of the adoption, and the acknowledgments of filings of each rule with the Secretary, the Clerk of the House of Representatives and the Secretary of the Senate. The court sought to inspect the register, and after a lengthy search, the Governor's Office produced the register for 1985 through 1990 from a closet. Apparently, the register since 1990 has been neglected and does not exist, and the register before 1985 is now lost or misplaced.

The APA is very important. Administrative rules have the force and effect of law, if properly adopted under the APA. However, the ASG's Executive Branch has apparently not taken the APA very seriously in recent years. While the Lieutenant Governors were ultimately responsible for this laxness, we think their failure to comply with the law was principally inattention by the ASG's legal advisors, particularly within the Governor's Office but also in the Executive Branch outside of the Governor's Office.

■ However, despite procedural deficiencies, administrative rules are valid and enforceable against persons who have actual knowledge of the rules. A.S.C.A. § 1009(b). The CCJS applied for land use and building permits for construction of the hall extensions, under the ASCMA and ASCMP rules, and certainly had actual knowledge of the ASCMP rules.

Thus, the ASCMP rules are valid and effective as to the CCJS.[15]

### 3. Construction without permits.

The ASCMA requires a land use permit for "all uses, developments, or activities which impact the coastal zone." A.S.C.A. § 24.0505(a). The coastal zone includes all private and public land in American Samoa, except lands solely under federal control. *See* A.S.C.A. § 24.05003(a). Thus, the CCJS needed to obtain a land use permit for construction of the hall extensions before commencing any work on. the project, in accordance with the land use permit system implemented by the ASCMP rules. *See* ASCMP rules § 26.0207(a) and related definitions in ASCMP rules § 26.0204. A building permit was also a prerequisite to actual construction. *See* 1 *Uniform Building Code, Short Form* § 301(a) (1964), adopted by A.S.C.A. § 26.1001.[16]

The CCJS applied for both land use and building permits to construct the hall extensions in August 1994. Although the applicant clearly has the responsibility to obtain necessary permits and approvals, *see* ASCMP

---

[15] Under § 24.0506(b) of the ASCMA, the rules preceding the ASCMP rules, A.S.A.C. §§ 26.0201-26.0211 (Rule 12-88), remain in effect until the ASCMP rules are promulgated as final rules. The ASG should still comply with the rule filing requirements for the ASCMP rules. Otherwise, the ASG may not be able to enforce the ASCMP rules against a person who is without actual knowledge of the ASCMP rules and must rely on the predecessor rules, which may or may not cover a particular current situation.

[16] Each edition of the *Uniform Building Code* is issued with the approval of the International Conference of Building Officials. The comparable current licensing provision is the *Uniform Building Code* § 106.1 (1994). The ASG's Department of Public Works ("DPW") usually refers to standards in the current edition of the *Uniform Building Code* for oversight of building construction. However, in American Samoa, the outmoded 1964 edition of the *Uniform Building Code, Short Form* is still the only legally enforceable law in this field. Despite the significant changes in building methods since 1964, the Legislature has turned down bills to enact an updated building code on numerous occasions.

rules § 26.0207(b), apparently the CCJS's application loitered in the DPO until it was forwarded for the Governor's necessary approval for construction on the ASG's land in February 1995. We think that the CCJS's frustration over the bureaucratic process, coupled with the CCJS's desire to meet the estimated completion date of September 30, 1994, at least partially explains the significantly completed construction of the hall extensions by February 1995. In any event, however, the CCJS violated the law by building without the requisite permits.[17]

When construction begins without the land use and building permits, the project may be stopped. ASCMP rules § 26.0218; *Uniform Building Code* § 106.1 (1964).[18] The CCJS was served with proper stop orders on February 16 and 22, 1995, but continued with the hall extension project. Unquestionably, the CCJS violated these lawful orders as well.

Because the hall extension construction did not comply with the ASCMP rules, the CCJS is responsible for removing the extension and properly disposing of all resulting solid waste on the land.

### 4. Administrative fines.

The ASCMA provides for civil fines imposed by this court for violations the ASCMA or ASCMP rules not to exceed $5,000 per day against individuals and $10,000 per day against corporations. A.S.C.A. § 24.0505(a) & (b). On March 23, 1995, the chairman of the PNRS board purportedly levied a $30,000 fine on the CCJS as part of one of two options given for the CCJS to take in response to three cited violations of building without a land use permit, building within the 50-foot stream setback required by the ASCMP rules § 26.0228(d)(2), and failing to comply with the stop order issued on February 16, 1995.

The ASCMA does not provide any administrative authority to assess fines. The unlawful attempt to exact this penalty from the CCJS was a flagrant abuse of power. Although the CCJS tentatively capitulated, this

---

[17] The ASG requests the court to impose fines and exemplary damages pursuant to A.S.C.A. §§ 24.0509(a) and(b) for the CCJS's failure to obtain the necessary permits before construction, and for the CCJS's violations of two stop orders. These statutory provisions give the High Court discretion to determine the amount of the fine against a corporation, and only set a ceiling of $10,000 per violation. Given the circumstances of this case, and since there is no statutorily compelled "floor" for violations of A.S.C.A. § 24.0509(a), we decline to impose any fine on the CCJS for these violations.

[18] *See also Uniform Building Code* § 104.2.4 (1994).

144

illegal assessment was fortunately set aside by later events. The PNRS board cannot impose, collect, or attempt to impose or collect, fines for failure to comply with the ASCMA or ASCMP rules.

## B. Summary Eviction

The ASG gave proper notice to terminate the at-will periodic tenancy with the CCJS.[19] The ASG explicitly notified the CCJS that it was unwilling to negotiate a purchase of the building and fixtures. Therefore, even though the CCJS has "purchased" the building, or will have purchased it upon paying the amortized purchase price in full, the at-will periodic tenancy only permits the CCJS to remove machinery, equipment and personal property from the premises upon termination of the lease relationship.[20] The CCJS must vacate the land.

## C. The CCJS's account payable.

While the Coral lease required the lessee or its assignees to make monthly payments of $900 for rent and $245 for the amortized balance of the purchase of the building and fixtures, a total of $1,145, after the first six months during the initial term of the lease, the ASB actually paid $1,150, monthly in effect, on the CCJS's behalf. We cannot tell from the ASG's accounting in evidence exactly how the ASG credited these payments to rent or the amortized balance. However, the CCJS clearly owed the ASG $10,800 on the combined amounts on October 19, 1995, which was reduced to $2,550 as of December 31, 1995. The CCJS is prepared to pay the deficiency.

The CCJS also still possesses and uses the premises by virtue of the temporary injunction. It should bring current any rent due and unpaid for the continuation of the periodic tenancy, and remit payment for any unpaid portions of the amortized purchase price for the building and fixtures.

## CONCLUSIONS OF LAW

---

[19] The ASG raised the issue of improper use of the premises, specifically the regular conduct of bingo games by the CCJS and its sublessees or licensees, suggesting that this use was disallowed under the terms of the Coral lease and possibly criminal under A.S.C.A. § 46.4301. We do not need to address this issue, however, because the CCJS's at-will periodic tenancy was terminable for any reason, with or without cause, upon one month's notice.

[20] *See* Coral lease, clause 13.B.2.

We will reiterate and summarize our conclusions of law.

1. The ASG consented to the assignment of the Coral lease in the event of Coral's loan default by the consent to mortgage of June 29, 1987. Moreover, by accepting rent from and dealing with the CCJS, the ASG waived its right to object to the CCJS's assumption of rights and obligations under the lease. Therefore, the CCJS is properly before the court as the lessee in this dispute. The ASB is properly before the court as the leasehold mortgagee.

2. The ASG effectively granted the lessee in the Coral lease the use of public land for 45 years by giving the lessee the unilateral right to exercise options to renew at the end of an initial nine-year term for up to four additional lease terms. This grant contravened statutory public policy, unless and until the Legislature reviews and fails to disapprove the lease. Because the Coral lease has not been submitted to the Legislature for review, the Coral lease never became effective.

3. Because the Coral lease was ineffective, the CCJS had an at-will periodic tenancy with the ASG, which incorporated all the terms of the Coral lease except duration. Both parties were able to terminate the at-will periodic tenancy with or without cause at any time, as long as the party seeking to terminate the tenancy provided at least one month's notice. The ASG gave one month's notice to the CCJS and lawfully terminated the at-will periodic tenancy as of January 15, 1996.

4. The benefit of maintaining an at-will periodic tenancy or entering into a new lease agreement is not a liberty or property interest giving rise to substantive or procedural due process rights. The Governor's decision to terminate an at-will tenancy in government land or refuse to lease government land did not result in deprivation of substantive due process and did not require the minimal procedural due process elements of notice of and meaningful participation in an administrative hearing. The PRC did not violate procedural due process by excluding the CCJS and ASB from its meetings regarding the Coral lease, because the PRC is empowered only to make recommendations to the Governor, not to adjudicate contested cases or promulgate rules.

5. The Governor's decision to terminate the at-will periodic tenancy or to decline forming a new lease was not arbitrary, capricious, or an abuse of his discretion in violation of substantive due process considerations.

6. The ASCMA is not unconstitutional on the grounds that it was not enacted by two successive legislatures. The ASCMA affects land use but does not divest title interests or impair cultural patterns.

146

7. The ASCMP rules were not promulgated in compliance with statutory directives because the DDPO, the authorized rule maker, has not filed the ASCMP rules with the Secretary of American Samoa and the Legislature. However, the ASCMP rules are binding and enforceable on the CCJS and ASB, since each had actual knowledge of the rules.

8. · The CCJS built the hall extensions without the requisite land use permit in violation of A.S.C.A. § 24.0505(a) and without the requisite building permit in violation of § 301(a) of the 1964 Uniform Building Code, enacted by A.S.C.A. § 26.1001.

9. The ASCMA does not empower the PNRS board to assess fines administratively for failure to obtain the required land use permit or to comply with a stop work order, or for any other violations of the ASCMA or ASCMP rules.

10. The CCJS must leave the premises and remit payment to the ASG for its remaining liabilities from the at-will periodic tenancy and subsequent tenancy at sufferance.

## ORDER

The CCJS shall, within 30 days after the entry of this order:

 1. remove the hall extensions built without land use and building permits;
 2. remove from · the land all solid waste resulting from demolition of the hall extensions from the land, at the CCJS's expense and with due consideration to the lawful property rights of other landowners near the land and disposal site and between both locations;
 3. vacate the land, and reeenter the premises only to exercise its remaining rights under paragraph B of clause 13 of the Coral lease; and
 4. remit payment to the ASG the total amount of outstanding liabilities for rent under the at will periodic tenancy and holdover tenancy at sufferance, to and including the day the CCJS vacates the land, and for unpaid portions of the amortized purchase price for the building and fixtures.

The temporary injunction is dissolved 30 days after the entry of this order.

It is so ordered.[21]

---

[21] The ASG can still ·honor the obligations to Coral it undertook in 1986 and to the ASB in 1987, and, in 1992, led the CCJS and ASB to reasonably believe would be carried forward. It can enter into a new

lease agreement, at least for the duration of the CCJS/ASB loan transaction, to protect the CCJS's and ASB's legitimate financial interests, and, if required, submit the new lease for legislative review under A.S.C.A. § 37.2030 and support approval of the lease before the Legislature.